UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WELLS FARGO BANK, NATIONAL ASSOCIATION,
in its capacity as Indenture Trustee,

                        Plaintiff,

– against –

CIT BANK, N.A.,

                        Defendant.

**OPINION AND ORDER**

15 Civ. 9861 (ER)

---

Ramos, D.J.:

    Wells Fargo Bank, National Association, in its capacity as indenture trustee for the Riverview Mortgage Loan Trust 2007-3 ("Plaintiff" or "Wells Fargo" or the "Trustee"), brings this action against CIT Bank, N.A. ("Defendant" or "CIT") to enforce its contractual right to audit CIT's servicing records for certain mortgage loans.[1]  Before the Court is CIT's motion to dismiss the Complaint for lack of subject matter jurisdiction.  For the reasons set forth below, CIT's motion is DENIED.

## I. BACKGROUND[2]

### A. The Parties' Rights and Obligations Under the SSA

    Riverview Mortgage Loan Trust 2007-3 (the "Trust"), Wells Fargo, and CIT, among others, are parties to a Sale and Servicing Agreement ("SSA"), dated September 28, 2007, that establishes CIT as a servicer for certain reverse mortgage loans held by the Trust (the "Loans").

---

[1] Financial Freedom Senior Funding Corporation ("Financial Freedom") was also initially named as a defendant, but the Trustee voluntarily dismissed its claims against that entity on March 22, 2016.  Doc. 21.

[2] The following facts are drawn from the allegations in the Complaint, the documents attached thereto, and the declarations and exhibits submitted in connection with the motion to dismiss.  *See LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.").

Compl. (Doc. 1) ¶¶ 2, 13, Ex. A ("SSA").[3]  The Loans secure certain notes (the "Notes") issued by the Trust to a number of investors (the "Noteholders").  *Id* ¶ 2.

At the time the Complaint was filed, the outstanding principal balance of all of the Loans (roughly 4,000 in total) was approximately $430 million, with an average balance of over $100,000 per Loan.  *Id.* ¶ 14; Garfield Decl. (Doc. 28), Ex. E ("Offering Circular") at 8, 33–34.  At one time, CIT serviced approximately 3,200 Loans; currently, however, it services approximately 1,800.  Offering Circular at 8, 33–34; Pl.'s Opp'n Mem. at 7.  In exchange for its services, CIT receives a fee of $35 per Loan serviced per month, which would appear to currently total approximately $750,000 per year.  SSA § 1.01.

Each Loan is insured by the Federal Housing Administration ("FHA"), a division of the United States Department of Housing and Urban Development ("HUD").  Compl. ¶ 13.  Thus, if a Loan borrower borrows more than 98% of the value of the property securing the Loan, the Trust may assign the Loan to HUD, and the FHA will make an insurance payment to the Trust equal to the outstanding amount of the Loan.  *See* SSA § 4.03(c); Offering Circular at 10.  Alternatively, if a Loan becomes due and payable before the borrower has borrowed more than 98% of the property's value, and if the proceeds from a sale of the property are insufficient to repay the Loan, the Trust can submit an insurance claim to HUD to recover the balance from the FHA.  Offering Circular at 9–10.[4]

---

[3] Financial Freedom is the signatory to the SSA, but CIT succeeded to some or all of Financial Freedom's rights and obligations under the agreement. Compl. at 1 n.1, ¶ 8. For ease of reference, the Court refers to CIT in place of Financial Freedom where applicable.

[4] Section 255 of the National Housing Act governs the insurance program, the purpose of which is:

> (1) to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at a time of reduced income, through the insurance of home equity conversion mortgages ["HECMs"] to permit the conversion of a portion of accumulated home equity into liquid assets; and

Pursuant to the SSA, CIT is responsible for submitting qualifying Loans to HUD in order to collect insurance payments from the FHA. SSA § 4.03(c). If HUD denies insurance coverage as a result of CIT's failure to properly service a Loan, CIT is contractually obligated to repurchase that Loan from the Trust:

> In the event that HUD disavows the insurance coverage on any Mortgage Loan serviced by [CIT] due to the failure of [CIT] to service the Mortgage Loan in strict accordance with the terms of this Agreement and the HUD Handbook, [CIT] shall repurchase such Mortgage Loan at the Purchase Price within five (5) Business Days of the day on which such insurance coverage was denied by HUD.

*Id.* § 4.13(a).

Given the important role CIT plays in this insurance scheme, the SSA provides the Trustee with a right to audit CIT's servicing records:

> Right to Examine Servicer Records.
>
> The Indenture Trustee, the Depositor, or their designees shall have the right to examine and audit any and all of the related books, records, or other information of either Servicer, whether held by such Servicer or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans serviced by it, during business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice. The party requesting such audit shall pay its own expenses associated with such examination.

*Id.* § 4.26.[5] Moreover, the SSA provides the Trustee with a right of indemnification in the event that CIT fails to perform its contractual obligations:

---

(2) to encourage and increase the involvement of mortgagees and participants in the mortgage markets in the making and servicing of home equity conversion mortgages for elderly homeowners.

12 U.S.C. § 1715z-20(a).

[5] CIT also provided Noteholders with access to certain summary information on a monthly basis regarding its servicing of the Loans. Garfield Decl. ¶ 4.

3

> Indemnification of the Trust by the Servicers.
>
> Each Servicer shall indemnify and hold harmless the Depositor, the Seller, the Trust, the Owner Trustee and the Indenture Trustee (each such party, an "Indemnified Party") and hold each of them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Indemnified Party may sustain as a result of the failure of such Servicer to perform its duties and service the Mortgage Loan serviced by it in strict compliance with the terms of this Agreement . . . .

*Id.* § 6.06.

### B. Noteholders Direct the Trustee to Audit CIT's Servicing Records

In or about July 2014, Jeremy Garfield, a director of Noteholder Dexia Credit Local ("Dexia"), reviewed summary information provided by CIT that he claims indicated more than $17 million in Loan payment shortfalls to the Trust. Garfield Decl. ¶ 5. Based on his previous experience managing other investments backed by government-insured mortgage loans, Garfield believed that the most plausible explanation for a shortfall of such magnitude was CIT's failure to properly service and/or secure FHA insurance for qualifying Loans. *Id.* Garfield cites as an example one Loan that had an ending balance of $164,286. *Id.* ¶ 6. The net proceeds from the sale of the property securing the Loan amounted to only $35,181. *Id.* Had CIT secured FHA insurance for the Loan, the Trust could have recovered the balance from HUD. *Id.* However, because CIT ostensibly failed to submit that one Loan to HUD, the Trust lost $129,105. *Id.*

On July 14, 2014, Garfield advised the Trustee of the Loan payment shortfall and requested that the Trustee obtain from CIT information necessary to confirm whether CIT had properly serviced and submitted Loans to HUD. *Id.* ¶ 7, Ex. A at 3. Approximately five weeks later, on August 21, 2014, CIT responded to the Trustee's inquiry, stating that the Trustee would need to submit a formal written request with citation to the contractual provision providing

authority for the request. *Id.*, Ex. A at 1. During the next several months, the Trustee, along with certain Noteholders, made further efforts to obtain information from CIT to confirm whether CIT had properly serviced and submitted Loans to HUD. *Id.* ¶ 8. CIT allegedly rebuffed these efforts. *Id.*

Ultimately, in October 2014, a group of Noteholders (including Dexia) holding over 96% of the outstanding principal balance of the Notes directed the Trustee to exercise its contractual right to audit CIT's servicing records. *Id.* ¶ 10, Ex. B. According to Garfield, the Noteholders believed that an audit would confirm whether CIT's servicing failures were depriving the Trust of material benefits to which it was entitled under the terms of the SSA, including the right to receive FHA insurance payments on qualifying Loans and the right to CIT's repurchase of any Loans that HUD rejects due to CIT's failure to properly service the Loans. *Id.* ¶ 11. On October 29, 2014, the Trustee forwarded the Noteholders' request to CIT. *Id.*, Ex. C at 1. CIT responded to the Trustee on January 15, 2015, explaining that the Trustee's audit request was "completely unwarranted and unreasonable." *Id.*, Ex. C at 2.

Months later, on June 25, 2015, the Trustee retained Concentrance Consulting Group, Inc. ("Concentrance") to conduct the audit with respect to approximately 50 to 300 Loans serviced by CIT. Johnson Decl., Ex. A. Pursuant to a Due Diligence Review Contract, the Trustee agreed to pay Concentrance between $82,491 and $244,491, depending on the number of Loans Concentrance would ultimately review. *Id.*, Ex. A at 6.

Thereafter, on July 13, 2015, the Trustee sent CIT a formal notice of its intent to examine and audit CIT's servicing records with respect to 305 Loans in accordance with its rights under the SSA. *Id.*, Ex. B. CIT responded on July 29, 2015, stating that it would provide Concentrance with access to certain of the requested information but first demanding that

5

Concentrance, among other things:  execute a satisfactory confidentiality agreement; explain in writing the nature and purpose of the audit and the rationale for including each Loan in the population of Loans that are the subject of the audit; and reduce the number of Loans to be subject to the audit to no more than 195.  *Id.*, Ex. C.  On August 11, 2015, the Trustee responded, asserting that the conditions set forth in CIT's letter were inconsistent with the SSA.  *Id.*, Ex. D.  Notwithstanding its objection, the Trustee disclosed that the purpose of the audit was to determine whether CIT had been properly servicing the Loans.  *Id.*

On or around September 15, 2015, CIT provided the Trustee with a proposed Nondisclosure Agreement.  Compl. ¶ 21, Ex. B ("CIT NDA").  Among other things, the CIT NDA purported to:  deem as "Confidential Information" any and all records relating to the Loans or to CIT's performance of its obligations under the SSA, *id.* § 1(a); deem all Confidential Information to be the property of CIT, *id.* § 2(d); prohibit the Trustee from disclosing any Confidential Information or any report based upon Confidential Information to any Noteholder, *id.* § 2(c); and require the Trustee to indemnify CIT "against any and all claims, demands, damages, actions, causes of action, losses and liabilities (including reasonable attorneys fees and court costs), arising out of, related to, or made or incurred in connection with any unauthorized disclosure or use of Confidential Information by the Trustee" or any Noteholder, *id.* § 4.  According to the Trustee, CIT maintained that it would not permit the Trustee to access its servicing records unless the Trustee executed the CIT NDA.  Compl. ¶ 26.

After further communications, on September 18, 2015, the Trustee provided CIT with a revised NDA.  Johnson Decl., Ex. E ("Trustee NDA").  The Trustee NDA narrowed the scope of the term "Confidential Information" to encompass only documents relating to CIT's "research, development, or business affairs that CIT does not disclose to the public in the ordinary course of

6

its business." *Id.* § 1(a). The Trustee NDA also provided that the Trustee could disclose to Noteholders any report based on an audit of CIT's records, as long as the Trustee first gave CIT an opportunity to review the report and assert confidentiality over any portion thereof. *Id.* § 2(c), (d). According to the Trustee, CIT rejected the Trustee NDA and demanded that the Trustee execute the agreement CIT originally proposed. Compl. ¶ 27.

### C. CIT Publicly Discloses Possible Breaches of Its Servicer Obligations

On November 13, 2015, CIT filed its Form 10-Q with the SEC. Garfield Decl., Ex. G. In that report, CIT disclosed that in the third quarter of 2015, HUD's Office of Inspector General had served subpoenas on the company regarding its servicing of certain government-insured reverse mortgage loans. *Id.* at 84. CIT explained that it was responding to the subpoenas and that it did not have "sufficient information to make an assessment of the outcome or the impact of the . . . investigation." *Id.*

CIT further disclosed that "[a]s a servicer of residential mortgage loans, [it was] exposed to contingent obligations for breaches of servicer obligations as set forth in industry regulations established by HUD and FHA and in servicing agreements with the applicable counterparties, such as Fannie Mae and other investors, which could include fees imposed for failure to comply with foreclosure timeframe requirements." *Id.* The company stated that it had "established reserves for contingent servicing-related liabilities," and that although the company "believe[d] that such accrued liabilities [were] adequate, it [was] reasonably possible that such losses could ultimately exceed the Company's liability for probable and reasonably estimable losses by up to approximately $26.4 million." *Id.*[6]

---

[6] After this action was filed, on March 1, 2016, CIT disclosed to the SEC that it would be unable to timely file its 2015 annual report, because management had identified a "material weakness" in its reverse mortgage loan servicing business. Garfield Decl., Ex. H at 2. Specifically, CIT disclosed that:

7

**D. The Trustee Brings This Action to Enforce Its Contractual Rights**

On December 17, 2015, the Trustee instituted this action against CIT, alleging that CIT breached the SSA by refusing to allow the Trustee to conduct an audit of its servicing records and by demanding that the Trustee sign the CIT NDA as a precondition to any audit.  Compl. ¶¶ 28–33.  The Trustee seeks specific performance of CIT's obligations under the SSA, as well as indemnification for the Trustee's losses, costs, fees, and expenses arising from CIT's failure to comply with its contractual obligations.  *Id.* ¶¶ 33–36.  On April 1, 2016, CIT moved to dismiss the case due to lack of subject matter jurisdiction.  Doc. 24.  The Trustee opposes the motion.

## II. DISCUSSION

The only issue before the Court is whether the Trustee has satisfied the amount in controversy requirement set by 28 U.S.C. § 1332.  CIT maintains that the value of the Trustee's suit falls below the $75,000 minimum, and that the Court therefore lacks jurisdiction to hear the case.  For a number of reasons, the Court disagrees.

A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a "reasonable probability" that the claims were in excess of the statutory jurisdictional amount at the time the action was commenced.  *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 93 F.3d 1064, 1070 (2d Cir. 1996) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994)); *see also Kheel v. Port of N.Y. Auth.*, 457 F.2d

---

controls are not adequately designed and maintained to ensure the key judgments and assumptions developed from loan file reviews or other historical experience are accurately determined, valid and authorized; the data used in the estimation process is complete and accurate; and the assumptions, judgments, and methodology continue to be appropriate.

*Id.*  On a July 28, 2016 investor call to discuss the company's financial results for the second quarter of 2016, Carol Hayes, CIT's CFO, disclosed that as a result of this "material weakness," the company brought its reserves for contingent servicing-related liabilities to approximately $500 million on the approximately $7 billion of filed claims and loans in the foreclosure process.  Trustee's Aug. 22, 2016 Ltr. (Doc. 33), Attach. at 4.  Hayes stated that the company was "very disappointed with these developments," but that it had "made good progress implementing enhancements that strengthen the operations and controls" and that it "believe[d] these actions [would] mitigate exposure on future maturity events on the remaining $13 billion of loans serviced."  *Id.*

46, 48 (2d Cir. 1972). Where jurisdictional facts are challenged, the party asserting jurisdiction must support those facts with "competent proof" and justify its allegations by a "preponderance of the evidence." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meridien Square, Inc.*, 30 F.3d 298, 304–05 (2d Cir. 1994) (quoting *McNutt v. Gen. Motors Acceptance Corp. of Indiana, Inc.*, 298 U.S. 178, 189 (1936)).

However, "[t]he rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). In order to justify dismissal, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289; *see also Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 116 (2d Cir. 2002) ("This Court recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.") (quoting *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)); *Tongkook*, 14 F.3d at 785 ("[T]he legal impossibility of recovery must be so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim.").

The Trustee alleges that the amount in controversy "exceeds the sum of $75,000." Compl. ¶ 9. CIT fails to establish to a legal certainty that this is not so.

### A. The Indemnification Claim

First, the Trustee seeks indemnification of its attorney's fees and expenses incurred in connection with its efforts to audit CIT's records and asserts that the fees will almost certainly amount to more than $75,000. Compl. ¶¶ 34–36; Pl.'s Opp'n Mem. at 21.[7] Because these costs are recoverable pursuant to the parties' contract, they may be used to satisfy the jurisdictional

---

[7] The Trustee does not appear to be seeking indemnification of any other types of losses or damages sustained as a result of CIT's failure to comply with its obligations under the SSA. *See* Pl.'s Opp'n Mem. at 21 (arguing with respect to its cause of action for "indemnification of its costs and attorney's fees").

9

amount. *Givens v. W.T. Grant Co.*, 457 F.2d 612, 614 (2d Cir. 1972), *vacated on other grounds*, 409 U.S. 56 (1972); *see also BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 314 (S.D.N.Y. 2013).

Although the Court cannot say with certainty what the Trustee's fees and expenses will ultimately be, or whether the Trustee will ultimately be entitled to recover them, it is not legally certain that the Trustee will be unable to recover over $75,000 on its indemnification claim. To the contrary, given the sophistication of the parties and their counsel, the nature of the dispute, and the value of the assets underlying this case, it is not a stretch for the Court to conclude that the indemnification claim is likely worth more than the statutory minimum. *See BanxCorp*, 978 F. Supp. 2d at 314 (finding that the plaintiff's claim for attorney's fees put it over the amount in controversy threshold, since the fees "almost surely would total in the tens of thousands of dollars at least"); *see also* Def.'s Mem. at 17 n.9 (conceding that "courts have allowed an unspecified amount of attorneys' fees to put a party over the amount-in-controversy threshold . . . [where] the fees have been hardly speculative"). Indeed, at the time the Trustee filed its opposition brief, its fees and expenses had already amounted to $62,973.58, Johnson Decl. ¶ 7, and the parties have yet to even reach the merits of the case.

CIT argues that attorney's fees may only be included in the amount in controversy calculation if they were incurred before jurisdiction was invoked, relying on *Crane Equipment & Services, Inc. v. B.E.T. Construction, Inc.*, No. 14 Civ. 175 (WMS), 2015 WL 471323 (W.D.N.Y. Feb. 4, 2015); *Houston v. Scheno*, No. 06 Civ. 2901 (SJF), 2007 WL 2230093 (N.D.N.Y. July 31, 2007); and *Sierp v. DeGreen Partners LP*, No. 14 Civ. 2353 (PHX) (DGC), 2015 WL 464338 (D. Ariz. Feb. 4, 2015). Def.'s Mem. at 16. All three of these cases involved claims that were removed from state to federal court, and in each case, the district court

ultimately concluded that the jurisdictional amount was not met because the attorney's fees were too speculative. *See Sierp*, 2015 WL 464338, at *4 (following other courts in the Ninth Circuit in concluding that "future attorney's fees are too speculative to be included"); *Houston*, 2007 WL 2230093, at *3–4 (finding that it could not "be ascertained from the face of the complaint and the notice of removal that the amount in controversy, inclusive of attorney's fee[s] . . . would result in a claim against defendant in excess of the . . . jurisdictional amount"); *Crane*, 2015 WL 471323, at *4 (finding it "speculative to assume the attorney's fees would bring the amount in controversy past the required $75,000" because the party invoking jurisdiction "failed to support its allegation" that they would).

Here, by contrast, it is not at all speculative to conclude that the Trustee's indemnification claim is worth more than the jurisdictional amount. In that sense, the Court finds this case more akin to *BanxCorp*, wherein the district court concluded that it could reasonably estimate the plaintiff's attorney's fees. 978 F. Supp. 2d at 314. Moreover, as in *BanxCorp*, and unlike the cases to which CIT cites, this case was initially filed in federal court, thus mandating application of the legal certainty test. *Id.* at 312–14; *see St. Paul Mercury*, 303 U.S. at 290–91 ("A different situation is presented in the case of a suit instituted in a state court and thence removed. There is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court or that the parties have colluded to that end. For if such were the purpose suit would not have been instituted in the first instance in the state but in the federal court.") (footnote omitted). Applying that test, the Court finds that the Trustee's indemnification claim alone easily satisfies the amount in controversy requirement.

## B. The Breach of Contract Claim

The Trustee also seeks specific performance of CIT's obligation to permit an audit of its servicing records. Compl. ¶¶ 28–33. CIT asserts that "in *DiTolla*, the Second Circuit recognized that the monetary value of [audit or accounting] rights cannot be determined for purposes of calculating the amount-in-controversy requirement." Def.'s Mem. at 9 (citing *DiTolla v. Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 276–77 (2d Cir. 2006)); *see also id.* at 1 ("Federal courts have uniformly concluded that the valuation of audit rights is an inherently speculative exercise that cannot satisfy the amount-in-controversy requirement for diversity jurisdiction."). CIT reads *DiTolla* too expansively. In fact, *DiTolla* merely recognized, as other courts have, that "[c]alculating the amount in controversy in an action for an accounting is not a straightforward task. As the remedy sought is equitable, and not legal, a monetary value cannot be *easily* assigned." 469 F.3d at 276 (emphasis added); *see also Rockwell v. SCM Corp.*, 496 F. Supp. 1123, 1125 (S.D.N.Y. 1980) ("When equitable relief is sought, it becomes increasingly more difficult to place a value upon the controversy."). Though difficult and not straightforward, the task is not impossible, as CIT would have this Court believe.

When damages are not requested, "the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy." *DiTolla*, 469 F.3d at 276–77 (quoting *Kheel*, 457 F.2d at 49); *see also Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."). The amount must be "capable of valuation in monetary terms" and must not be too "speculative" or "indirect." *Kheel*, 457 F.2d at 49. "[A]bsolute certainty in valuation of the right involved is not required to meet the amount in controversy requirement." *Moore v.*

12

*Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975). However, the amount must be capable of being "ascertained pursuant to some realistic formula." *Id.*

As an initial matter, CIT urges the Court not to apply the legal certainty test to the Trustee's contract claim, arguing that the test does not apply to claims seeking equitable relief. Def.'s Mem. at 6–7. When it established the test, however, the Supreme Court made no distinction between claims for damages and claims for equitable relief. *See St. Paul Mercury*, 303 U.S. at 288–90. Rather, the distinction the Court made was between claims initially brought in federal court and those removed from state court. *Id.* at 290–91. For a claim filed in federal court, the Court explained, the plaintiff is entitled to a rebuttable presumption because "[h]e knows or should know whether his claim is within the statutory requirement as to amount." *Id.* at 290. Decades after *St. Paul Mercury* was decided, the Supreme Court in *Hunt* relied on the test to determine whether the amount in controversy was satisfied by a plaintiff seeking only declaratory and injunctive relief to prevent the enforcement of a state statute. 432 U.S. at 346. The Court ultimately found in favor of federal jurisdiction, noting that the record before it precluded "saying 'to a legal certainty'" that the harms that would flow from enforcement of the statute would not, "over time, if they [had] not done so already," amount to the required minimum. *Id.* at 348.

CIT relies entirely on cases from other circuits to support its narrow interpretation of the legal certainty test. Def.'s Mem. at 6–7 (citing *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 800 (7th Cir. 2003); *Federated Mutual Insurance Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 807 (11th Cir. 2003); *St. Paul Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998); and *Sanchez v. Monumental Life Insurance Co.*, 102 F.3d 398, 401–02 (9th Cir. 1996)). In the Second Circuit, however, courts have continued to apply the test to claims seeking

13

declaratory and equitable relief.  *See, e.g.*, *Moore*, 511 F.2d at 1006; *Am. Safety Casualty Ins. Co. v. 385 Onderdonk Ave., LLC*, 124 F. Supp. 3d 237, 241–43 (E.D.N.Y. 2015); *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW) (FM), 2011 WL 4352384, at *7–9 (S.D.N.Y. Aug. 11, 2011), *adopted in part by* 823 F. Supp. 2d 221, 229 (S.D.N.Y. 2011); *Correspondent Servs. Corp. v. JVW Inv., Ltd.*, No. 99 Civ. 8934 (RWS), 2004 WL 2181087, at *6 (S.D.N.Y. Sept. 29, 2004), *aff'd sub nom. Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767 (2d Cir. 2006); *Sager Spuck Statewide Supply Co. v. Hartford Casualty Ins. Co.*, No. 96 Civ. 550 (FJS), 1996 WL 743840, at *3 (N.D.N.Y. Dec. 5, 1996).

Notwithstanding the precedents that are at odds with CIT's position, this Court need not decide whether the legal certainty test applies to the Trustee's contract claim.  Even without the benefit of a presumption, the Trustee has sufficiently shown to a reasonable probability that the value of the claim is in excess of the statutory jurisdictional amount.

First, "the value of the right being protected" by way of this action can be measured by calculating the outstanding principal value of the approximately 1,800 Loans being serviced by CIT.  After all, the very purpose of the Trustee's contractual audit right is to ensure that CIT is properly servicing the Loans and making appropriate payments to the Trust.  *See Rockwell*, 496 F. Supp. at 1125 (measuring the amount in controversy in an action seeking the production of a shareholder list by the value of the plaintiff's shares, "the property right which plaintiff [sought] to protect by invocation of one of the equitable remedies"); *see also Soley*, 2011 WL 4352384, at *7–9 (measuring the amount in controversy by the value of each loan and investment underlying the action for accounting, as they were the "principal 'objects' of [the] litigation"); *Sills v. Ronald Reagan Presidential Found., Inc.*, No. 09 Civ. 1188 (GEL), 2009 WL 1490852, at *5 (S.D.N.Y. May 27, 2009) (measuring the amount in controversy in an action for accounting by

the sum of donations the plaintiff contended were not used as specified, the "object of [the] litigation—what plaintiff [sought] to protect").[8]  Although that precise number is not evident from the parties' submissions, the Court easily concludes that it meets the statutory minimum, as CIT was servicing approximately 1,800 Loans, the average balance of which was over $100,000, and the outstanding principal balance of all 4,000 Loans was over $430 million at the time the Complaint was filed.  Compl. ¶ 14; Offering Circular at 8, 33–34.

Alternatively, the value of "the injury being averted" by way of this action also satisfies the jurisdictional minimum, as the Trustee seeks an audit of CIT's servicing records in order to, among other things, investigate the cause of a $17 million shortfall in Loan payments to the Trust, reduce that shortfall to the extent CIT breached its obligation to repurchase any of those Loans from the Trust, and prevent future shortfalls from occurring.  *See Hunt*, 432 U.S. at 347 (measuring the "value of the object of the litigation" by losses that had been suffered and that would continue to be suffered in the absence of injunctive relief).  Relying on *DiTolla*, CIT argues that the relief the Trustee might seek in some future action cannot satisfy the amount in controversy in this action, Def.'s Mem. at 13, but *DiTolla* does not stand for such a broad proposition.  In fact, in *DiTolla*, the Second Circuit did consider the damages that might be sought from the administrator of a fund should an accounting of the fund reveal fraud.  469 F.3d at 277.  Because the court "[could not] say beyond mere speculation, however, whether those

---

[8] *DiTolla*, on which CIT heavily relies, did not concern a plaintiff seeking to *protect* his rights.  Rather, the plaintiff in that case sought an accounting to determine whether he had any rights at all.  469 F.3d at 277 ("DiTolla asserts only a beneficial interest in the Pool.  By doing so he does not place the entirety of the Pool 'in controversy,' because he makes no claim that he owns it and at most he suggests a claim to some yet undefined portion the amount of which is contingent on the outcome of the accounting."); *see also id.* at 277 n.4 (distinguishing DiTolla's case from one in which a plaintiff "sought an accounting of a $4,000 farm, in which she had an ownership interest").

damages, if they [were] awarded, would be more than" the jurisdictional minimum, the court found jurisdiction lacking. *Id.*[9]

Here, the Trustee points to an actual, identifiable injury that it seeks to investigate and ameliorate—a $17 million shortfall to the Trust. Moreover, if CIT failed to properly service even one of the 1,800 Loans, damages are almost certain to be in excess of $75,000. Based on available information, the Trustee already suspects that the Trust lost over $129,000 due to CIT's failure to submit just one of the Loans to HUD. Garfield Decl. ¶ 6. Accordingly, the Trustee's breach of contract claim also satisfies the amount in controversy requirement.[10]

## III. CONCLUSION

For the reasons set forth above, CIT's motion to dismiss is DENIED, and CIT's request for oral argument is DENIED as moot. The parties are directed to appear for a conference on **April 6, 2017 at 11:00 a.m.** The Clerk of the Court is respectfully directed to terminate the motions, Docs. 24 & 30.

It is SO ORDERED.

Dated: March 29, 2017
       New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.

---

[9] Even in *Macken*, on which CIT also relies, the Seventh Circuit considered that it would take "only a grave error" to result in future damages over $75,000. 333 F.3d at 800.

[10] The Court declines to address whether the Trustee's willingness to pay Concentrance over $75,000 to conduct the audit alternatively demonstrates the significant amount at stake in this action. *See* Pl.'s Opp'n Mem. at 18.